IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  15-cv-01586-LTB

ROXANNE RYAN,

       Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

       Defendant.

_____

ORDER
_____

Plaintiff, Roxanne Ryan, appeals from the Social Security Administration ("SSA")

Commissioner's final decision denying her application for disability insurance benefits, filed

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for

supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral argument would not

materially assist me in the determination of this appeal.  After consideration of the parties'

briefs, as well as the administrative record, I AFFIRM the Commissioner's final order.

## I.  STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying her applications

for disability insurance benefits and for supplemental security income filed in August of 2006.

[Administrative Record ("AR") 229-35, 236-240]  After the applications were initially denied,

an Administrative Law Judge ("ALJ") conducted an evidentiary hearing on June 11, 2009 and

issued a written ruling on July 31, 2009 denying her applications. [AR 81-103, 108-28]  Plaintiff

appealed and, on July 8, 2010, the Appeal Council issued an order remanding the matter back to

the ALJ for further development of the record and for reconsideration. [AR 129-32]  The SSA

Appeals Council ordered, in part, that on remand that ALJ should obtain medical expert opinion

evidence regarding the nature and severity of Plaintiff's mental health impairments. [AR 131]

The ALJ held a second evidentiary hearing on February 9, 2011. [AR 49-80]  After

reconsideration, the ALJ again denied Plaintiff's applications in a decision dated May 3, 2011.

[AR 18-44, 1183-1200]  The SSA Appeals Council declined to hear Plaintiff's request for review

of this ruling, and Plaintiff appealed to this court. [AR 1-7]  On March 25, 2014, Judge Marcia

Krieger reversed and remanded the ALJ's denial on the basis that the Appeals Council instructed

the ALJ to obtain medical expert evidence to determine whether any of Plaintiff's medically

determinable impairments was equivalent to one of a number of listed impairments deemed to be

so severe as to preclude substantial gainful employment, but that the medical opinion report

obtained "was not sufficient to comport with the remand order." [AR 1114-25]  *See Ryan v.

Colvin*, 2014 WL 1238186 (D. Colo. Case No. 12-CV-02870-MSK, Mar. 25,

2014)(unpublished) (ruling that the report failed to compare Plaintiff's identified mental

impairments with those listed impairments and thus it "did not meet the requirements of the

[Appeals Council's] remand order or Social Security policy").

Upon remand, a different ALJ heard Plaintiff's case.  After another evidentiary hearing

was held on June 9, 2014 [AR 1065-1108], the new ALJ denied her applications on September 4,

2014, on the basis that she was not disabled because considering her age, education, work

experience and residual functional capacity ("RFC"),  jobs exist in significant numbers in the

national economy that Plaintiff could perform (Step Five). [AR 1133-59]  The SSA Appeals

Council subsequently denied Plaintiff's request for review of this ruling, making the SSA

2

Commissioner's denial final for the purpose of judicial review. [AR 937-68]  Plaintiff timely filed her complaint with this court seeking review of the Commissioner's decision.

## II. FACTS

Plaintiff was born on October 25, 1973. [AR 368]  She has some college education and completed her certification as a nursing assistant.  Her prior employment includes work as a construction worker, stock clerk, informal waitress, cashier and nursing assistant.  Plaintiff alleged that on April 30, 2005, she became disabled due to her major depressive disorder, anxiety, degenerative disc disease and chronic obstructive pulmonary disease (COPD). [AR 368]  On appeal here, she alleges disability based on a combination of impairments including severe degenerative changes in her lumbar spine; COPD; tinnitus; atypical migraine; fibromyalgia; panic disorder with agoraphobia; memory disorders; major depressive disorder; and dysthymia with early onset. [Doc #13 pg.8]

The medical records regarding Plaintiff's physical conditions reveal that she hurt her back in a work-related accident in the 1990s. [AR 528, 652, 791]  Later, in 2003, Plaintiff was diagnosed with COPD with episodic exacerbations, increased fatigue and difficulty breathing with coughing spasms. [AR 774, 808, 870]

Following her onset date in April 2005, Plaintiff reported to her primary care physician, Michael Adams, MD, recurrent back pain and increased stress in September of 2005. [AR 642-44]  Dr. Adams prescribed pain and anti-anxiety medications.  He also ordered physical therapy in October of 2005, but Plaintiff only went to one session in December of 2005. [AR 590-92, 643]

In December 2005 Plaintiff reported continued back pain and reported being involved in a motor vehicle accident. [AR 645]  An MRI dated December 8, 2005, revealed broad based disk protrusion at L5-S1 with central canal stenosis and posterior annular tear, as well as bilateral neural foraminal stenosis, left greater than right.  It also revealed mild diffuse annular disk bulging at L4-L5. [AR 566, 794]  Brent Clyde, MD, a neurosurgeon, evaluated Plaintiff for back pain that radiated down her legs, and opined that the MRI findings were consistent with progression of prior disk injury with very severe degenerative change at L5/S1 and disk protrusion. [AR 528-530, 791-92]  In March 2006, Dr. Adams continued to treat Plaintiff with medication and noted that Plaintiff exhibited some fibromyalgia point tenderness. [AR 647]

On September 4, 2006, Plaintiff reported to the hospital suffering from back pain after lifting a child from a grocery cart. [AR 625-632]

On October 31, 2006, Plaintiff underwent a consultive examination with Ardella Kemmler, MD. [AR 650-56]   Plaintiff reported low back pain, chronic bronchitis, and depression, and no problems with activities of daily living except she cannot do any kind of deep cleaning, and difficulty getting her leg up over the bathtub when her back is really hurting. Upon examination, Dr. Kemmler noted that Plaintiff was tender to palpation over her lower lumbar area and that her straight leg raising caused pain. [AR 653]

During 2007, she continued on pain medications prescribed by Dr. Adams, who again noted tender points consistent with fibromyalgia on his examinations. [AR 754-56]  On January 10, 2007, Rodney Anderson, MD, a non-examining state agency physician, reviewed Plaintiff's medical records related to her stenosis and annular disk bulge at L4-L5. [AR 465-72]  He opined that Plaintiff could physically perform medium work, but would need to avoid concentrated

exposure to dust, fumes, gases, and poor ventilation. [AR 466-469]  Thomas Toft, MD, another

non-examining state agency physician concurred with this opinion on May 2, 2007. [AR 516-

520]

An MRI on January 28, 2008 showed degenerative disk disease with disk desiccation at

L4-L5 "similar compared to the prior study" and degenerative disk disease with disk desiccation

and significant loss of height at L5-S1. [AR 671, 818-24]  On examination of Plaintiff, Dr. Clyde

found normal strength, reflexes and sensation in her lower extremities. Plaintiff had negative

straight leg raises, and ambulated normally. [AR 816-17]  Dr. Clyde opined that the MRI

findings were "mild" and showed disk degeneration at L5-S1 with slight protrusion to the left

paracentral location slightly compressing the lateral recess and foramen. [AR 817]  Dr. Clyde

opined that a simple discectomy would not solve Plaintiff's significant back pain; rather an

arthrodesis or gesture placement was indicated, but not at this time due to Plaintiff's young age.

[AR 817]  On July 23, 2008 she reported being able to walk four miles per day on a treadmill.

[AR 753]

On March 3, 2009, Dr. Adams noted that on examination Plaintiff had "nearly all" of the

standard trigger points for fibromyalgia. [AR 752]  At that office visit, Dr. Adams worked with

Plaintiff to fill out a "Fibromyalgia  Residual Functional Capacity Questionnaire" for the SSA.

[AR 752, 662-66]  Dr. Adams indicated he did not know whether she had fibromyalgia, but

identified diagnoses of:  COPD, lumbago, vertigo, tinnitus, anxiety attacks, and kidney stone; for

which he indicated a "fair" prognosis. [AR 662]  Dr. Adams further indicated that he believed

that Plaintiff was not a malingerer, and that emotional factors contributed to her pain and

limitations. [AR 662]  It was his opinion that Plaintiff would be limited to, essentially, less than a

full range of sedentary work, with sitting limited to 30 minutes at a time for a total of 4 hour per

day, standing 1 hour at a time, and needing to get up and walk around every 30 minutes for two

minutes, and the need to change positions at will.  He opined that she would need unscheduled

breaks, probably every hour for 2-3 minutes each hour, and she could lift and carry up to 20

pounds occasionally, and had limited overhead reaching (50% of the time), could stoop only 5%

of the day, and crouch only 5-10% of the day.  He estimated she would be absent from work

more than four times per month. [AR 664-665]  Three months later, on June 2, 2009, Dr. Adams

clarified that Plaintiff could not sit longer than 15 minutes without moving or standing, and

reiterated that she would likely be absent more than four times per month. [AR 750]

In April 2009 Plaintiff went by ambulance to the emergency room reporting extreme

back pain. [AR 682, 691-700]

A January 14, 2010 MRI showed mild annular disk bulging with small left paracentral

posterior annual tear at L4-L5, which appears slightly larger than before, and prominent annular

disk bulging at L5-S1, with central disk protrusion, possibly slightly larger than before. [AR

832-33]  In the follow-up examination, Dr. Clyde indicated that this MRI showed severe

degenerative disc collapse and "significant" progression in the modic endplate changes at L5-S1.

[AR 813-15] He opined that Plaintiff's pain was primarily generated by the degenerated disc

disease at L5-S1, with some contribution from the L4-5 level. [AR 815]  Plaintiff's options were:

surgery, epidural injections, physical therapy, chiropractic treatment or medical management.

[AR 815]  Also at this time, on January 14, 2010, Plaintiff was again examined by consultive

examiner Dr. Kemmler. [AR 888-90]  Dr. Kemmler opined that Plaintiff had back pain resulting

in chronic leg pain with some minor weakness in the leg and no difficulty with gait.  [AR 889]

During 2010, Dr. Adams's notes indicate that Plaintiff's pain radiated from her back into her lower pelvis and into her left leg [AR 860], and that she was treating her back pain with too much medication and should instead be exploring other treatment options. [AR 862-863]  Dr. Adams referred Plaintiff for fusion surgery or spinal injections. [AR 860]

Plaintiff's MRI on January 31, 2011 revealed no gross interval change at L4-L5 and L5-S1, and showed a that the annular tear at L4-L5 was "much less conspicuous," that the L5-S1 moderate disk bulge is stable, but the posterior midline protrusion is a "little smaller now."  [AR 825-26]  At Plaintiff's examination on February 3, 2011, Dr. Kemmler noted that Plaintiff had mildly reduced strength and her reflexes in her lower extremities were "extremely poor," but no problems with her gait.  Dr. Kemmler diagnosed low back pain due to a disc herniation at L4-L5 and L5-S1, resulting in radiculopathy extending around her abdomen and into her anterior thigh. [AR 870-72]

In December of 2011, Dr. Adams indicated his concern that Plaintiff's use of narcotics was enhancing her pain. [AR 909-13] At this time Dr. Adams diagnosed chronic lumbago with lumbar degenerative disc disease with an element of fibromyalgia and costochondritis.  He noted that Plaintiff's lack of insurance was impacting her ability to have surgery. [AR 913]   On March 1, 2012 Dr. Adams again noted that she had tender fibromyalgia points. [AR 909]  On March 29, 2012, Plaintiff reported to the emergency room with abdominal and leg pain, where she was diagnosed with acute left inguinal pain consistent with femoral nerve pain. [AR 919-26]

Plaintiff began seeing new primary care provider, Melanie Metcalf, MD, in February 2013, when Dr. Metcalf diagnosed lumbar radiculopathy and sacroiliitis, and indicated that her pain was poorly controlled.  [AR 1288]  In June 2013, Dr. Metcalf referred Plaintiff to a pain

clinic based on her chronic SI joint pain on the left, osteophytes and subchondral cyst formation at the S1 joint, degenerative disc disease and a broad based disc bulge at L5-S1. [AR 1277]  An x-ray of her lumbar spine on June 12, 2013 revealed mild to moderate degenerative changes at L4-5 and moderate to severe changes at L5-S1. [AR 1294]

At the University of Colorado Spine & Rehab Clinic, Alison Rae Putnam, D.O., diagnosed Plaintiff with:  left sacroiliac pain with left lower extremity pain, thought to be related to her sacroiliac joint or radicular symptoms; lumbar degenerative disc disease; and chronic pain syndrome on June 26, 2013. [AR 1227-31]  On July 18, 2013 Plaintiff received injections for lumbosacral, dorsal ramus and lateral branch blocks and, in August 2013 she reported little relief and indicated she was ready to discuss surgery. [AR 1231-35]  On September 23, 2013 she underwent a radiofrequency ablation procedure of the nerves at the L5 dorsal ramus, S1, S2, and S3 sacral lateral branches. [AR 1231-35]  After this procedure, Plaintiff saw J. Peter Witt, MD, a neurosurgeon at the pain clinic. [AR 1236-37]  Dr. Witt opined that fusion surgery was possible, but the chance of treating her chronic pain with that procedure was very low. [AR 1236]  On October 16, 2013, Plaintiff received a left L5 transforaminal steroid injection. [AR 1238] On November 13, 2013 Plaintiff went to the emergency room with left lower quadrant pain, which she attributable to her back problems. [AR 1240-1244]  In January 2014, Plaintiff saw Dr. Metcalf for abdominal pain associated with low back pain and radiation to left anterior thigh, and reported that "nerve blocks have not improved the pain." [AR 1267]

As to Plaintiff's mental health records, they commence in March/August 2004, when Dr. Adams noted that she had a flat affect and a sad countenance and "situational melancholic depression." [AR 634-36]  Then, a year later in March of 2005, Plaintiff was taken to the

emergency room for depression related to situational problems for divorce/custody battle and a drug overdose. [AR 537-40]  In May 2005, Plaintiff went to the emergency room for shortness of breath, and was diagnosed as an anxiety attack and was prescribed an anti-depressant. [AR 531-35]

On October 20, 2006, Plaintiff reported depression and exogenous family stress during her visit with Dr. Adams. [AR 500]   She asked to be on anti-depressant therapy and sought a prescription refill for her panic attacks. Her depression inventory revealed a melancholic type depression and, based on a positive response to bipolar questions, Dr. Adams assessed "bi-polar depression." [AR 500]

On December 20, 2006, Plaintiff saw Gerald E. Manwill, Ph.D., for a consultative psychological evaluation. [AR 656-60]  Following an interview and testing, Dr. Manwill diagnosed Plaintiff with:  panic disorder with agoraphobia, dysthymic disorder with early onset, and major depressive disorder (recurrent, moderate).  He assessed Plaintiff a Global Assessment of Functioning (GAF) score of 53.  Dr. Manwill noted an extended history of chronic mild depression; that she met some (but not enough) of the criteria of a borderline personality disorder; she did not have full criteria for a bipolar disorder; and she show recurrent panic attacks with agoraphobia in that she had a very difficult time being in places such as Wal-Mart. [AR 660]  Dr. Manwill indicated that Plaintiff's prognosis was guarded.  He opined that she had the ability to understand, remember, and carry out simple instructions on a sustained basis, and the ability to respond appropriately to supervision and co-workers on a sustained basis. [AR 660]

On January 11, 2007, Rebecca Baily, Ph.D., a medical consultant, reviewed Plaintiff's records and found she suffered from panic disorder with agoraphobia; dysthymic disorder with

early onset; and MDD, recurrent, moderate. [AR 473-86]  She opined that Plaintiff was moderately limited in one area of sustained concentration and persistence, as well as in three areas of social interaction (the ability to interact with the general public, to accept instructions and respond to supervisors, and to get along with co-workers). [AR 487-90]  Her conclusion was that Plaintiff "appears to be capable to performing simple, routine work with limited social contact on a sustained basis." [AR 489]  On January 11, 2007, Arthur Miller MD, provided a psychiatric consultive review that agreed. [AR 491-94]  On May 2, 2007, Grant Fleming provided a consultive review that was also in concurrence. [AR 502-15, 524-27]

On January 6, 2010, Dr. Manwill saw Plaintiff for a second consultative examination. [AR 893-97]  After examination, Dr. Manwill indicated that Plaintiff continued to evidence symptoms consistent with a dysthymic disorder that involves chronic mild depression. [AR 896]  She also evidenced a history of major depressive episodes that were recurrent and moderate, as well as a panic disorder that was improved since 2008. [AR 896]  He diagnosed dysthymic disorder with early onset; major depressive disorder, recurrent moderate (in full remission); and panic disorder with agoraphobia.  He assessed her a GAF of 55. [AR 897]

Plaintiff then underwent a mental status examination with consultive examiner Juliet Jett, Ph.D. on January 10, 2011. [AR 864-66]  After examination, Dr. Jett determined that Plaintiff had panic disorder with agoraphobia and dysthymic disorder with early onset, and assessed her a GAF of 45.  [AR 866]  Dr. Jett opined that Plaintiff had: marked limitations in the ability to make judgments on complex work decisions, and moderate limitations on the ability to make judgments on simple work related decisions, and to understand, remember, and carry out complex instructions. [AR 866-69]

In February 2013, Plaintiff began seeing Katrin Seifert, a psychotherapist. [AR 1267-96] Plaintiff reported issues with interrupted sleep, and disturbing dreams and with images linked to her father's suicide, and well as sadness, guilt, and regretful prior substance abuse. [AR 1292]  In March of 2013, Ms. Seifert diagnosed Plaintiff with depression. [AR 1278-1290]  Plaintiff saw Ms. Seifert again in August and September 2013, where her mood was reported as "up and down," and she continued to struggle with coping with family issues. [AR 1272, 1274]

At the hearing on June 9, 2014, Robert Pelc, Ph.D. testified as a medical expert. [AR 1080-88]  Prior to the hearing, Dr. Pelc completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), dated June 7, 2014. [AR 1263-65]  In so doing, Dr. Pelc opined that Plaintiff  had moderate limitations in the ability to: understand, remember, and carry out complex instructions; and make judgments on complex work-related decisions. [AR 1263] He further opined that she had moderate to marked limitation in the ability to interact appropriately with the public, as well as a moderate ability to interact appropriately with supervisors, co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. [AR 1264]

At Plaintiff's hearing, Dr. Pelc testified that Plaintiff's medically determinable mental health impairments were dysthymic disorder or major depressive disorder; and panic disorder with agoraphobia.  He opined that: 1) her ability to perform activities of daily living was mildly limited; 2) her social functioning was moderately limited, although her capacity for interacting with the public was markedly limited; and 3) her ability to maintain concentration, persistence, and pace in simple information processing was mild, but for more complex information processing was moderate. [AR 1082-83]  Dr. Pelc noted that her inability to go out in a public

11

setting alone meant that she "certainly has a significant limitation in terms of work alternatives." [AR 1084]  When asked whether Plaintiff could return to work, Dr. Pelc testified that he believed that her anxiety/panic attacks had lessened because she led a limited lifestyle, and if she was not living a restricted lifestyle by returning to a work environment, "the likelihood would be that she would have an increase in her anxiety symptoms and principally an increase in the [frequency and intensity] of her panic attacks." [AR 1087-88]

## II. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct.  2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the

impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

In his ruling, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process. [AR 1029-45]  In so doing, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date (Step One). [AR 1030]  The ALJ further determined that Plaintiff had the severe impairments of: chronic low back pain with left lower radicular symptoms secondary to degenerative disc and joint disease in her lumbosacral spine; chronic COPD; major depressive disorder, and panic disorder with agoraphobia, (Step Two), but he concluded that these impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 1030-1033]

The ALJ then determined that Plaintiff had the RFC perform a limited range of sedentary work, except that she cannot climb ladders, ropes or scaffolds, she can only tolerate occasional interactions with co-workers and supervisors, and only minimal interaction with the general

13

public. [AR 1033]  In addition, she is limited to "unskilled/semi-skilled work" which is defined as work with a specific vocational preparation (SVP) rating of 3 or less. [AR 1033]  Based on this assessed RFC, the ALJ found that Plaintiff was unable of performing her past relevant work as a certified nurse's assistant (Step Four). [AR 1043-44]

The ALJ further found, however, that considering Plaintiff's age, education, work experience, and assessed RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. [AR 1044-45]   Specifically, the ALJ found that she could perform the work of final assembler, document preparer and surveillance system monitor. [AR 1044]  Because Plaintiff could perform work that exists in significant numbers, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under disability as defined by the SSA. [AR 1045]

## V. STANDARD OF REVIEW

This court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).  Thus, the function of my review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, *supra*, 822 F.2d at 1521 (*citing Richardson v. Perales*, 402

U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)).  I may not re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).  With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. RFC ASSESSMENT

On appeal Plaintiff claims that the ALJ erred when assessing her RFC by failing to properly weigh the medical opinion evidence, and in failing to provide function-by-function mental limitations.  After considering the medical record, the ALJ found that Plaintiff could perform sedentary work (defined as work that involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools that involves sitting and often involves a certain amount of walking and standing) except that she cannot climb ladders, ropes or scaffolds.  She could only tolerate occasional interactions with co-workers and supervisors, and only minimal interaction with the general public.  Finally, the ALJ determined that she was limited to "unskilled/semi-skilled work" which he further defined as work with a specific vocational preparation (SVP) rating level of 3 or less. [AR 1033]

### A.  Physical Limitations

With regard to the physical limitations contained in her RFC, Plaintiff contends that the ALJ erred in discounting the opinion evidence provided by her treating physician, Dr. Adams. In March/June of 2009, Dr. Adams opined that Plaintiff was physically limited to sitting for 30

15

minutes at a time, for a total of four hours per day, and standing for an hour at a time, with the

need to get up and walk around every 30 minutes for two minutes, and the ability to change

positions at will.  He also opined that she would need unscheduled breaks, probably every hour

for 2-3 minutes each hour, and that she would be absent from work more than four times per

month. [AR 662-66, 748-50]

The ALJ concluded that Dr. Adams's opinions were entitled to only "some weight, not

substantial or controlling weight." [AR 1040-1]   In discounting his opinion, the ALJ first noted

that Dr. Adams indicated that Plaintiff "experienced chronic pain bilaterally in her cervical,

thoracic, and lumbar spine," when treatment notes and spine imaging only showed abnormalities

in Plaintiff's low lumbar spine, and there are no medical notes or tests indicating issues of

chronic pain in her cervical or thoracic spine. [AR 1041]  In addition, the ALJ noted that Dr.

Adams's opinions were in the form of check-box questionnaires that Dr. Adams and Plaintiff

completed together. [AR 752, 1041]  Finally, the ALJ found that Plaintiff had been "much more

active" than was indicated in Dr. Adams's opinion. [AR 1041]

The SSA regulations provide that an ALJ will give controlling weight to a treating

source's opinion if the ALJ finds the opinion "is well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

in [the] record." 20 C.F.R. § 404.1527(c)(2).  When a treating source opinion is not given

controlling weight, the ALJ considers a number of specific regulatory factors in determining how

much weight to accord to the opinion.  *See* 20 C.F.R. § 404.1527(c); *Oldham v. Astrue*, 509 F.3d

1254, 1257 (10th Cir. 2007).  An ALJ is not required to "apply expressly" every relevant factor;

rather, the ALJ's decision must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)(noting that when an ALJ decides to disregard a medical report by a claimant's physician, he must set forth specific, legitimate reasons for his decision).   The ALJ's order in this case was clear that he did not give Dr. Adam's opinion controlling weight – but, instead, gave it only "some weight" – and, likewise, the ALJ was clear as to his reasons why he discounted his opinion.  As a result,  I conclude that the ALJ's assessment and the weight given the Dr. Adams's opinion does not constitute error.

Plaintiff primarily takes issue with the ALJ's finding that "the medical evidence indicates that Dr. Adams and [Plaintiff] jointly prepared the residual functional capacity opinion [and] Dr. Adams went over the questions with [Plaintiff] and then completed the responses with her input." [AR 1041]  The ALJ thus determined that "the opinion is not as much a statement of his medical opinion as a recitation of [Plaintiff's] subjective complaints and reported limitations." [AR 1041] Plaintiff contends that this determination cannot support the decision to discount Dr. Adams's opinion because the Tenth Circuit has ruled that an ALJ cannot reject a treating physician's medical opinion, that is supported by the record, based on the ALJ's unfounded doubt about whether the treating physician's opinion/assessment was, in fact, his or her own. *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)(ruling that the rejection of a physician's opinion, based on the fact that a physician is an advocate for his or her patients, is no more than a conclusory statement contrary to the established process for weighing medical opinions)*; see also Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987)(ruling that the ALJ's rejection of the treating physician's opinion on the basis that he  "naturally advocates his

patient's cause" is insufficient and conclusory).

First, I note that the ALJ here did not reject Dr. Adams's opinion, but rather gave it less than controlling weight.  To the extent that Plaintiff argues that there is no evidence in the record that Plaintiff jointly prepared or had input into the opinion, it is clear that she was present at the time Dr. Adams completed the check box form.  Dr. Adams's notes state that Plaintiff "came in today for medication check in to fill a . . . functional capacity questionnaire for Social Security disability.  I have reviewed the records and gone through with her the five pages of questions.  I have completely reviewed her chart . . . to fill out a questionnaire." [AR 752]  This supports the ALJ's factual determination that the form represents, at least in part, Plaintiff's reporting of her restrictions and constitutes a reasonable inference from the evidence.

More importantly, the ALJ's decision to discount Dr. Adams's opinion as to her physical restrictions is also based on the fact that it is not supported by the record.  Specifically, there are no objective records supporting Dr. Adam's conclusion that Plaintiff experienced chronic pain in her cervical or thoracic spine.  Additionally, the ALJ's determination that Plaintiff had been "much more active" than indicated in Dr. Adams's opinion is supported by his findings throughout his order; for example, the ALJ noted several instances in which Plaintiff's reported activities were inconsistent with her allegations of disabling pain such as her attempts at employment (as a certified nursing assistant, cleaning up roofing material on a construction site, work as a real estate inspector and part-time pizza delivery person) and her reported exercise (walking about four miles a day on a treadmill). [AR 1037-38]  While it may be true that an ALJ's outright rejection of a treating physician opinion should not be based solely on the ALJ's conclusory determination that the doctor's opinion was disingenuous or not his or her own, that

is not the case here.  *See generally Boucher v. Astrue*, 2009WL737156 (D. Kan. 2009), *aff'd*, 371 F. App'x 917 (10th Cir. 2010)(unpublished)(ruling that the determination that the claimant was not fully credible was only one part of the ALJ's discounting of the treating physician's opinion, distinguishing the ruling in *McGoffin v. Barnhart, supra*).

**B. Mental Limitations**

Plaintiff also contends that the ALJ erred in assessing her RFC mental limitations because he gave Dr. Pelc's opinion "significant weight," but then failed to incorporate several of Dr. Pelc's determinations into her RFC.  Specifically, Plaintiff contends that the ALJ failed to incorporate (or specifically reject) Dr. Pelc's opinions that she was mildly limited in her ability to understand simple instructions and moderately limited in her ability to understand complex instructions, and that she was moderately limited in her ability to respond to usual work situations and to changes in a routine work setting. [AR 1263-4]

I agree with the Commissioner, however, that the ALJ's order properly weighed the various medical opinions of record in his determination of Plaintiff's mental restrictions as ultimately contained in her RFC.  First, as to Dr. Pelc's opinion that Plaintiff was moderately limited in her ability to respond to usual work situations and to changes in a routine work setting, while the ALJ did not specifically reject this opinion of functionality, he found that Dr. Manwill indicated that Plaintiff reported that she "had always been able the handle changes and pressure in the work setting." [AR 1041]  The ALJ also afforded Dr. Manwill's opinion "substantial weight" and relied upon it, as a conflicting opinion, when determinating that Plaintiff's RFC did not include a mental limitation related to her ability to respond to work situations and settings. Furthermore, as noted by the Commissioner, there was other evidence in the record – from Dr.

19

Jett and Plaintiff's mother – that Plaintiff handled changes and stress well. [AR 866 and 339,
1042]

As to Dr. Pelc's opinions related to Plaintiff's ability to understand instructions, the RFC
assessed by the ALJ incorporates such severity rating restrictions into the assessed functional
limitations.  While Dr. Pelc's assessment that Plaintiff was mildly limited in her ability to
understand simple instructions and moderately limited in her ability to understand complex
instructions was not specifically addressed in the ALJ's order, such limitations were accounted
for in his determination that Plaintiff could only perform semiskilled job – defined as  work
which needs some skills but does not require doing more complex work duties – or unskilled
jobs – defined as work which needs little or no judgment to do simple duties that can be learned
on the job in a short period of time in that a person can usually learn to do the job in 30 days, and
little specific vocational preparation and judgment are needed.  *See* 20 C.F.R. § 404.1568.  In
addition, the ALJ limited her RFC to jobs that had an SVP rating of 3 or less, meaning that the
lapsed time required to learn the job is over 1 month up to and including 3 months under the
Dictionary of Occupational Titles.

Plaintiff also contends that the ALJ erred in that his order failed to provide a function-by-
function assessment of her mental limitations.  In support of this assertion, Plaintiff notes that the
first denial of her case in July of 2009, the ALJ found only that Plaintiff was limited to
"unskilled work." [AR 115]  The Appeals Council subsequently ruled that this determination
was insufficient because "the decision only limits [Plaintiff] to unskilled work [and] it therefore
does not contain a complete function by function assessment of her ability to do work-related
mental activities." [AR 130-31]  In contrast, the ALJ's order on appeal here determined that

Plaintiff's mental limitations restricted her to 1) unskilled to semi-skilled work; 2) with an SVP level of less than 3 (meaning that the lapsed time required to learn the job is over 1 month up to and including 3 months); 3) with only occasional interaction with co-workers and supervisors, and with only minimal interaction with the general public. [AR 1033] Plaintiff argues that this does not constitute a "function-by-function" assessment of her limitations as was required by the Appeals Council. However, because ALJ's RFC assessment in the order on appeal in this case was sufficient, I disagree. *See e.g. Rex v. Colvin*, 26 F. Supp. 3d 1058, 1065 FN 4 (D. Colo. 2014)(ruling that a "function-by-function analysis of [the claimant's] mental residual functional capacity" is not required under Social Security Ruling 96-8p). In so doing, I likewise reject Plaintiff's argument to the extent that she asserts that the Appeals Council remand following a previous order somehow applies to the new order now at issue.

## C. Credibility

Plaintiff also asserts that the ALJ erred in assessing her credibility. The ALJ ruled that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms "are not entirely credible." [AR 1034] "[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)(citations omitted). A credibility analysis "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'" *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004)(*quoting* SSR 96–7p); *see also Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).

In arguing that the ALJ erred in his credibility determination, Plaintiff takes issue with the reasons provided in support of such finding. First, she contends that the ALJ reliance on her

"failure to pursue treatment" was misplaced due to reasons contained the record for her actions

such as she was afraid recommended chiropractic treatment would increase her back pain, or she

did not have insurance to cover the cost of surgery.  Furthermore, she contends that she did

pursue care in the form of medication management (as the "only viable and affordable option for

her to manage her symptoms") and in 2013 she did receive nerve blocks, as well as a nerve

ablation and a steroid injection, apparently contrary to the ALJ's findings.  Furthermore, Plaintiff

contends that the ALJ's determination that several of her activities were inconsistent with her

allegations of disabling pain (such as her caring for her grandchildren, including lifting a child

from a grocery cart, her attempts at employment after her onset date, her exercise on a treadmill,

her occasional overuse of pain medications, and her attempt to take college courses) were

actually only limited in nature or were not inconsistent with her level of disability.

However, the ALJ's order contains sufficient specific reasons, that are closely and

affirmatively linked to substantial evidence, for discounting of her credibility related to her

limitations due to pain.  *See Kepler v. Chater, supra*, 68 F.3d at 391 (ruling that because

credibility determinations are peculiarly in the province of the finder of fact, they will not be

disturbed when supported by substantial evidence).  Plaintiff improperly seeks to re-weigh the

conflicting evidence as to her credibility.  I find no error.

## VII. STEP FIVE

Finally, I address Plaintiff's contention that the ALJ's determination at Step Five of the

sequential process is not supported by substantial evidence because the testimony of the

vocational expert – Beth Cunningham –  regarding the number of jobs available in the national

economy (upon which the ALJ relied when determining that work was available for Plaintiff)

was arbitrary and unreliable and, in turn, did not constitute substantial evidence. [AR 1070-79]

Specifically, Plaintiff argues that the vocational expert's methodology used to determine the

number of jobs that existed for each identified occupation was not reliable and it utilized out-

dated data from 2008.  In support of her argument, Plaintiff submitted the report of an

independent vocational expert to the Appeals Council. [AR 1217-21] The Appeals Council ruled

that the testimony of the vocational expert, as relied upon by the ALJ, was reliable. [AR 937-38]

On appeal here, Plaintiff again argues that the vocational expert's opinion in this case was

unreliable in that it was based on a flawed methodology and out dated data.

At Plaintiff's hearing, the vocational expert testified that a person with the ability to

perform sedentary work, without climbing ladders or scaffolds, and limited to work with only

occasional interaction with co-workers and supervisors, and only minimal interaction with the

public, could perform the following jobs: 1) final assembler (DOT 713.687-018) with 12,357

jobs in the national economy and 740 in the regional economy; 2) document preparer (DOT

209.387-022) with 11,666 jobs in the national economy and 700 in the regional economy; and 3)

surveillance systems monitor (DOT 379.367-010) with 12,240 jobs in the national economy and

854 in the regional economy. [AR 1044]  The ALJ found that this testimony was consistent with

the information contained in the Dictionary of Occupational Titles. [AR 1045]

When the ALJ asked about how these jobs numbers would be affected if the person was

also limited to only minimal interaction with co-workers and supervisors, the vocational expert

opined that the availability numbers of those jobs would be reduced by 30%.  [AR 1045, 1076]

With regard to this testimony, the ALJ ruled that "[w]hile+ this testimony differs from the

Dictionary of Occupational Titles, the vocational expert based this analysis on her years of

experience as an expert." [AR 1045]  The ALJ the relied on the testimony of the vocational

expert to conclude that Plaintiff was capable of making a successful adjustment to other work

that exists in significant numbers in the national economy. [AR 1045]

It is undisputed that the data relied upon by the vocational expert was from 2008.  As

noted by the Commissioner, however, the Appeals Council correctly ruled that there is no

generally accepted rule of how frequently job numbers need to be updated [AR 1220] and, in

addition, that job numbers from 2008 fall almost in the middle of the alleged time range of

Plaintiff's period of disability.  Furthermore, to the extent that the opinion of the vocational

expert is not consistent with the DOT differs from that of Plaintiff's vocational expert, as set

forth in her supplemental report, I find no legal or regulatory authority of error by the ALJ.

Rather, the questioning of a vocational expert about the source of his or her opinion – and any

deviations from a publication recognized as authoritative by the agency's own regulations –  falls

within the ALJ's general duty to develop the record.  *Haddock v. Apfel*, 196 F.3d 1084, 1091

(10th Cir. 1999).  In this case the ALJ properly questioned the vocational expert and, to the

extent her testimony differed from the DOT, the ALJ developed the record by inquiring about

the inconsistency and then determining that her years of experience supported her analysis. [AR

1045]   Therefore, I find no error by the ALJ in his reliance on the vocational expert's testimony.

ACCORDINGLY, for the foregoing reasons, I AFFIRM the Commissioner's final order.


Dated: April __21__, 2016 in Denver, Colorado.

BY THE COURT:

__s/Lewis T. Babcock_____

LEWIS T. BABCOCK, JUDGE